# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Thomas Nash,

          Plaintiff,

v.

Optomec, Inc.,

          Defendant.

Civ. No. 15-1845 (RHK/BRT)
**MEMORANDUM OPINION AND ORDER**

Stephen C. Fiebiger, Stephen C. Fiebiger Law Office, Chartered, Burnsville, Minnesota, for Plaintiff.

Andrew E. Tanick, David McKinney, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

In this action, Plaintiff Thomas Nash alleges that his former employer, Defendant Optomec, Inc. ("Optomec"), terminated his employment on account of his age in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq*. Presently before the Court is Optomec's Motion for Summary Judgment; for the reasons that follow, the Motion will be granted.

## BACKGROUND

Viewed in the light most favorable to Nash, the record reveals the following facts, most of which are undisputed.

Nash was born in 1958 and obtained a Bachelor of Science degree in applied mathematics from St. John's University in 1980. After working a number of jobs over

the ensuing decades, he returned to school in 2011, enrolling in a nanoscience technology program at Dakota County Technical College ("DCTC").

In 2013, as part of his studies, Nash and several other students toured the St. Paul facility of Optomec, a New Mexico-based company that develops and manufactures 3D printing systems. At the time, Nash needed to complete an internship in order to obtain his degree, and he told one of his professors that he was interested in serving as an intern at Optomec. The professor, in turn, contacted John Lees, Optomec's 49-year-old Vice President of Engineering. Lees brought in Nash for two interviews and eventually offered him a full-time, paid internship for the summer and fall semesters, reporting directly to Lees; Nash was 54 at the time.

Nash began working for Optomec as a "lab technician" intern in July 2013, running tests on lab equipment, taking measurements, recording data, and cleaning the equipment. He initially shared these duties with two other interns: Travis Evans and Chenxing Pei, mechanical-engineering students at the University of Minnesota. Evans had been working for Optomec for a period of time before Nash arrived, and Lees asked Evans to help train Nash. Pei, who arrived a short time later, also helped train Nash on assembling and disassembling equipment in the lab. When Evans and Pei returned to school full-time in the fall of 2013, Optomec brought in a new intern, Dan Bakke, another engineering student at the University of Minnesota. Evans, Pei, and Bakke were all in their early twenties.

According to Nash, Lees "gave [him] the cold shoulder" during his internship. He avers that Lees would not invite him to join discussions in his office, as he did with

Evans, Pei, and Bakke.  He also alleges that Lees provided training to other interns that he did not receive.  Nevertheless, in several reports Nash submitted to DCTC, he described his internship positively.  He wrote, among other things, that he liked the experience of "working for a small company, with small teams, and not a lot of formality," and that he found the environment at Optomec "to be what [he had] expected, and the type of environment [he] enjoy[ed] working in."

At the conclusion of Nash's internship in December 2013, Lees submitted to DCTC a written review of Nash's performance.  His assessment was fairly tepid.  Though he recognized Nash offered "much appreciated discipline and rigor," Lees felt previous interns had exhibited "more learning potential."  On a scale from 1 to 5, he rated Nash a "3" for critical-thinking skills and noted that "[u]nderstanding and troubleshooting systems are . . . a bit beyond" him.  Lees also noted that lab procedures involving physical skill or dexterity were "challenging" for Nash.  Nash was not provided a copy of this assessment.

Nash completed his internship with Optomec and received an associate's degree from DCTC in December 2013.  Around that time, he informed Lees that he had enjoyed working at the company and was interested in a "permanent" position.  Lees spoke to John Wright, an Optomec engineer who had worked with Nash during his internship.  Like Lees, Wright harbored concerns about Nash, believing he was not a "skilled technician" and that he required detailed instructions in order to perform tasks.   Despite Wright's comments and his own misgivings with Nash's performance, Lees extended an offer of employment to Nash as a full-time lab technician in mid-December 2013.  Nash

accepted and began "regular" employment with Optomec in January 2014. At the time, Nash was the only full-time lab technician reporting to Lees, supporting the work of several new-product-development engineers. His duties were not appreciably different from those he had performed as a lab-technician intern.

Nash alleges that Lees's favoritism of younger employees continued after he began working for Optomec on a "permanent" (non-intern) basis. He claims, for example, that Evans – who was then working five hours per week as a student intern – was sent on company-paid trips to visit clients, including a trip to Germany, that were not offered to him.[1] He also claims that Lees showed favoritism in connection with a chemical spill in April 2014. Nash spent most of a work day cleaning the spill, aided for a short time by Bakke. But when the spill was discussed in a weekly meeting, Lees "emphasized concern about Bakke's exposure to the hazardous chemical from the spill, but made no mention of Nash's exposure," which Nash claims "humiliated" him. In addition, Nash asserts he was eventually told to report to Wright, while Bakke and Evans reported directly to Lees.

According to Lees, over time he became increasingly dissatisfied with Nash as a lab technician. Although Nash was performing adequately in that role, Lees believed he struggled with critical thinking and troubleshooting, traits he thought important as Optomec continued to expand. Wright expressed similar concerns to Lees, advising that Nash was not capable of "perform[ing] more troubleshooting [and] do[ing] a lot more independent work" or "go[ing] off and interfac[ing] with customers." Lees had similar

---

[1] Evans went on similar trips, including one to China, while Nash was still an intern in 2013.

discussions with Optomec's Chief Executive Officer, David Ramahi, who agreed with Lees's and Wright's assessments. Lees testified in his deposition:

> I was kind of taking stock of the current situation and looking ahead. We were anticipating getting further orders from our Chinese customer for more production equipment. . . . [M]y judgment was that I needed to have team members that were able to support customers and undertake, you know, a higher level of troubleshooting than we had been doing to that point. The business was growing. There was going to be a need to support more customers. We needed just a higher level of functionality across the board on the team.
>
> \*   \*   \*
>
> Other people who could fulfill the role of lab technician could learn from the experience . . . and build on that knowledge to function in a customer service role and in a troubleshooting role, but [Nash] was not able to build on that experience and take it to that next level. . . . If we continued to grow, we would likely hire someone to come into the role of lab technician and be able to learn and grow from it the way [others] had done, but [Nash] was not able to do.
>
> \*   \*   \*
>
> I decided that [Nash] was not – not progressing beyond the kind of basic lab skills. I had decided that I was kind of changing my views on what should – what was kind of the business function of the lab technicians, that they – I saw it as a way to bring people into the technology [] but then . . . grow and progress beyond that point, and I could see that [Nash] did not have the capability to progress beyond that point.
>
> \*   \*   \*
>
> And, you know, there were some . . . some of the issues with his performance were not getting better, despite us trying to coach him and work with him . . . basically kind of stubbornness and lack of willingness to progress. So I decided to let him go.

For his part, Nash disputes that he lacked troubleshooting skills and, in fact, successfully undertook several projects at Optomec that required him to problem solve.

- 5 -

He also avers that at no point prior to the termination of his employment did anyone from Optomec inform him that he had not been meeting expectations, adequately growing his skills, or demonstrating troubleshooting abilities. And, he notes that Optomec's written job description for the position of lab technician nowhere mentions troubleshooting or making independent trips to clients.

On June 6, 2014, Nash was called into a meeting with Lees and Wright. Lees informed Nash that his employment was being terminated because Lees wanted to move in a "different direction." The parties dispute what happened next. Lees and Wright testified in their depositions that upon hearing the news, Nash stood up, started shouting, and waved his arms in a threatening manner. Nash does not dispute becoming upset, but he denies having stood up, waving his arms, or acting threatening in any way. It is undisputed, however, that he repeatedly told Lees that his (Nash's) mother had sued a former employer for age discrimination and had settled on favorable terms. Nash further claims that he told Lees and Wright that he felt he was being discriminated against because of his age, and neither denied Nash's allegation. At the time of his termination, Nash was 55 years old.

On September 16, 2014, Nash filed a charge of age discrimination with the Minnesota Department of Human Rights ("DHR"). After an investigation, the DHR found no probable cause to believe Optomec had engaged in discrimination and issued Nash a right-to-sue letter. Nash then commenced the instant action in the Ramsey County District Court, alleging a single count of age discrimination in violation of the MHRA; Optomec promptly removed the action to this Court. With discovery complete,

Optomec now moves for summary judgment. The Motion has been fully briefed, the Court heard oral argument on April 11, 2016, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*);[2] Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

---

[2] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should be sparingly granted in discrimination cases. Because this Court has cited these cases for different legal principles that remain good law, it has not indicated such abrogation.

## ANALYSIS

**I.     Age-discrimination law generally**

The MHRA – like its federal counterpart, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* – renders it unlawful for an employer to discharge an employee because of his age. Minn. Stat. § 363A.08, subd. 2(2). Like a claim under the ADEA, the Court analyzes a claim under the MHRA using the familiar McDonnell Douglas burden-shifting framework. E.g., Chambers v. Travelers Cos., 668 F.3d 559, 566 (8th Cir. 2012); Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1136 (8th Cir. 2006).[3] Under this framework, a plaintiff must first establish a prima facie case of discrimination. E.g., Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012). If he does so, "the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant offers such a reason, the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for . . . discrimination." Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 914 (8th Cir. 2007) (citations omitted).[4] At all times, the ultimate burden of persuasion remains on the plaintiff. Ramlet v. E.F. Johnson Co., 507 F.3d 1149, 1153 (8th Cir. 2007).

---

[3] Generally speaking, claims under the MHRA are analyzed under the same standards as claims under the ADEA. See, e.g., Chambers, 668 F.3d at 566. Nevertheless, Nash argues that an ADEA plaintiff must show that age was the "but for" cause of his or her discharge, while an MHRA plaintiff need only show that age was a "motivating factor" in the discharge decision. (Mem. in Opp'n at 29-31.) The Court need not resolve this issue, because even under a less-stringent "motivating factor" standard, Nash's claim fails.

[4] This burden-shifting paradigm does not apply when a plaintiff proffers "direct evidence" of discrimination. See, e.g., Hutton v. Maynard, 812 F.3d 679, 683-84 (8th Cir. 2016). Nash does not rely on direct evidence here.

**II.     No prima facie case**

As the Court has noted previously, the elements of a prima facie case of age discrimination are not well established in our Circuit. See, e.g., Noreen v. Pharmerica Corp., 118 F. Supp. 3d 1130, 1136-37 & n.9 (D. Minn. 2015) (Kyle, J.), appeal docketed, No. 15-2917 (8th Cir. Sept. 1, 2015). "While the first three elements have been stated consistently – the plaintiff (1) was over 40, (2) suffered an adverse employment action, and (3) was meeting the employer's expectations or was qualified for the job – the last element has not." Id. at 1137 n.9.

Some cases have required a plaintiff to show he was replaced with someone *younger*, see, e.g., Hilde v. City of Eveleth, 777 F.3d 998, 1004 (8th Cir. 2015) (citing Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 515 (8th Cir. 2011)), which seems contrary to the Supreme Court's admonition that discrimination "cannot be [shown] from the replacement of one worker with another worker *insignificantly* younger," O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996) (emphasis added). Other cases have required a plaintiff to show he was replaced with someone *substantially* younger, see, e.g., Holmes v. Trinity Health, 729 F.3d 817, 822 (8th Cir. 2013), but the Circuit has not drawn a clear line between a younger employee and a substantially younger one. Compare Chambers, 668 F.3d at 566 (8-year age gap insufficient), with Hilde, 777 F.3d at 1004 (8-year difference sufficient). And yet other cases do not discuss age differences at all, requiring a plaintiff only to proffer some evidence "that age was a factor in the employer's termination decision." Tramp v. Associated Underwriters, Inc., 768 F.3d 793, 800 (8th Cir. 2014) (citation omitted).

Presumably, that would *permit* a plaintiff to offer evidence of age differences, which might (or might not) suffice, but would not *require* such evidence in order to establish a prima facie case.

Here, it is undisputed Nash has established the first three elements of his prima facie case. Optomec argues, however, that the record does not create a genuine issue as to the fourth element – however that element might be formulated. The Court agrees.

In attempting to establish that fourth element, Nash first argues that following his termination, his job duties were assumed by Evans and Bakke, each of whom was substantially younger. (Mem. in Opp'n at 32.) But even assuming that were true[5] *and* that age differences alone could establish the fourth element of a prima facie case, it is undisputed that Evans and Bakke handled Nash's duties only *temporarily*. "[T]he temporary replacement of [a] plaintiff by younger persons is insufficient, standing alone, to give rise to an inference of discrimination." Nemec v. Wal-Mart Assocs., Inc., Civ. No. 14-4450, 2015 WL 8492040, at *6 (D. Minn. Dec. 10, 2015) (Kyle, J.) (emphasis omitted) (quoting Matson v. Cargill, Inc., 618 F. Supp. 278, 283 (D. Minn. 1985) (Murphy, J.)); accord Bennis v. Minn. Hockey Ventures Grp., LP, No. 12-341, 2013 WL 3305213, at *11 (D. Minn. June 28, 2013) (Nelson, J.). It is undisputed that (i) Bakke left Optomec in the fall of 2014 and never returned and (ii) Evans accepted a different position (as an engineer) with Optomec shortly after graduating from the University of Minnesota in the summer of 2014, and there is no evidence that Evans performed any of

---

[5] Nash testified in his deposition that he did not know who assumed his duties after he was discharged. Evans testified that he and Bakke assumed those duties, while Wright – who was close in age to Nash – testified that he reassigned all of Nash's duties to himself.

Nash's former job functions once he became an engineer.  Furthermore, Wright testified in his deposition that Optomec never hired a permanent replacement for Nash, and that testimony stands unrebutted.  The fact that Evans and Bakke might have assumed Nash's duties for a short time does not suggest that age played a part in Nash's termination.  See also Lewis, 467 F.3d at 1136 ("We think that the important datum here is the age of the person whom the University chose as Mr. Lewis's permanent replacement.").

Nash also attempts to satisfy the fourth element of his prima facie case with evidence that, in his view, indicates age was the reason for his termination.  He notes, for example, that Lees showed "favoritism" to younger employees Evans, Pei, and Bakke, who were afforded off-site travel opportunities that he did not receive and given flexible working hours.  He also argues that the reasons Optomec has proffered for his termination were false, as discussed in more detail below (when discussing pretext).

Yet, despite filing a 53-page opposition brief, Nash nowhere addresses what are, in the Court's view, the most damning facts for his claim:  Lees hired Nash *twice* – first as an intern, then on a "permanent" basis – in 2013, and then terminated his employment in June 2014.  As Optomec correctly notes, "it is simply incredible" that Lees, "who hired [Nash] at age [54,] suddenly developed an aversion to older people less than [one] year later." Lowe v. J.B. Hunt Transp., Inc., 963 F.2d 173, 175 (8th Cir. 1992) ("The most important fact here is that plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing, and that the same person who hired him also fired him."); accord, e.g., Haigh v. Gelita USA, Inc., 632 F.3d 464, 470 (8th Cir. 2011) ("We have noted it is unlikely a supervisor would hire an older employee and then

discriminate on the basis of age, and such evidence creates a presumption against discrimination.") (quoting Fitzgerald v. Action, Inc., 521 F.3d 867, 877 (8th Cir. 2008)); Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 976 (8th Cir. 2006) (there is a "strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time"). Furthermore, Lees himself was over 40 and only a few years younger than Nash. These facts, too, undermine the notion that age played a role in the termination decision. See Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1337 (8th Cir. 1996) (casting doubt on inference of discrimination when decisionmaker also in protected class); see also Leicht v. Hawaiian Airlines, Inc., 77 F. Supp. 2d 1134, 1145 (D. Haw. 1999) ("When the decisionmaker is close in age to the plaintiff and is also within the protected category, the inference of discrimination is diminished."), rev'd on other grounds, 15 F. App'x 552 (9th Cir. 2001).

Hence, even if the evidence pointed to by Nash raised some suspicion of discrimination, that suspicion is completely eroded by the ages of the players involved and the fact that Lees (twice) hired Nash and then fired him in the span of less than a year. "[I]t is eminently reasonable to doubt that, as in this case, a worker hired at an age well beyond that at which the protections of the age discrimination law click in and terminated *within months*, that is, before he is appreciably older, was a victim of age discrimination." Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 361-62 (7th Cir. 2001) (emphasis in original) (cited with approval in Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 956 n.3 (8th Cir. 2012)).

**III.     No pretext**

Even if Nash had established a prima facie case, Optomec has proffered a legitimate, nondiscriminatory reason for his discharge: although he was performing adequately as a lab technician, he was not able to "grow" his skills in the way Lees envisioned moving forward. Having offered this reason, the inquiry proceeds to "a new level of specificity." Gibson, 670 F.3d at 856. At the third step of McDonnell Douglas, a plaintiff must point to sufficient evidence in the record "for the trier of fact to infer that the employer's proffered legitimate nondiscriminatory reason is not only pretext but that it is pretext *for discrimination*." Wagner v. Gallup, Inc., 788 F.3d 877, 886 (8th Cir. 2015) (emphasis added) (citation omitted). Stated differently, the showing of pretext necessary to survive summary judgment "requires more than merely discrediting an employer's asserted reasoning for [an employment action]. A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." Gibson, 670 F.3d at 856. As already noted, the Court does not believe Nash clears this hurdle here, as Lees twice hired him before firing him less than a year later. Rather that suggesting age discrimination, this strongly suggests it was Nash's skill set that led to his discharge.

But in any event, the Court does not believe the evidence cited by Nash suffices to create a genuine issue of fact as to pretext. Nash points to several different items in an attempt to do so, but in the Court's view, the record simply does not suggest age bias played a part in his termination.

### A. "Better" treatment of younger employees

Nash first argues (again) that younger employees were shown favoritism. But in support, he largely points to trivial matters, such as not being mentioned in the weekly meeting discussing the chemical spill, not being invited to join discussions in Lees's office, and being required to report to Wright rather than directly to Lees. The nation's employment laws are not a "general civility code," Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113 (8th Cir. 2001), and do not protect against "normally petty slights, minor annoyances, and simple lack of good manners" that are common in the workplace and "all employees experience." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); accord, e.g., Ewald v. Royal Norwegian Embassy, 2 F. Supp. 3d 1101, 1121-22 (D. Minn. 2014) (Nelson, J.) (plaintiff's embarrassment at being excluded from certain events not actionable). Moreover, the triviality of these issues is underscored by the fact that Nash never complained about them or other "slights" during his time at Optomec, or in the reports he submitted to DCTC. Indeed, he sought a "permanent" position with Optomec despite Lees's "cold shoulder" and "favoritism" of younger employees during his tenure as an intern.

Nash also contends that Pei was paid more during his internship, despite not having a college degree. But he points to no evidence in the record suggesting that *other* younger interns, such as Evans and Bakke, also were paid more than him, belying the

suggestion the pay difference had anything to do with age.[6]  Moreover, Nash points to nothing to suggest that his degree in mathematics had (or *should have* had) any significance to Optomec to justify a higher rate of pay.  Optomec is a research, development, and manufacturing company, and hence it is hardly surprising it might pay more to an engineering student at a major four-year research university than one in a two-year associate's program at a local community college.  Indeed, the company likely was using the internship program to groom future engineers – as evidenced by the fact that Evans returned to the company as an engineer following his internship.[7]

Nash also points to the business trips offered to Evans as evidence of favoritism.  But once again, there is nothing in the record suggesting that other, younger interns also were offered those trips, belying that age was Optomec's motivation.  Indeed, Nash *acknowledges* in his brief that "Bakke was never sent on any trouble[-]shooting or service trips to [a] client.  Nor was he sent to any off-site locations for any other reason by Optomec." (Mem. in Opp'n at 19.)  Nor does the Court believe that Evans (the only intern who went on company-paid travel) and Nash were similarly situated.  True, each worked as a lab-technician intern and performed similar functions, but Evans had been working for Optomec before Nash's arrival and, in fact, helped to train him.  See, e.g.,

---

[6] Indeed, as noted by Optomec's counsel at oral argument, the record reflects that Evans and Bakke were in fact paid at the same hourly rate ($16) as Nash.  (See Bakke Dep. at 9-10; Lees Dep. Ex. 21.)

[7] Nash also notes that when explaining the pay differential in his deposition, Lees testified that Pei was an "outstanding student and exceptional young engineer."  Nash seizes upon the word "young" to suggest Lees treated him differently because of his age.  But this type of stray remark, unrelated to the decisional process, is too insignificant to support a discrimination claim.  See, e.g., Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006).

Torgerson, 643 F.3d at 1051 (at the pretext stage, plaintiff must show comparators are similarly situated "in all relevant respects," which is a "rigorous" standard). And once Evans had performed well on his first client trip, it made sense for the company to send him on additional trips, especially those involving clients with whom he had already established rapport and familiarity. At bottom, the Court "find[s] [the] evidence of the allegedly better treatment of [younger] employees weak and not probative of discrimination." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d Cir. 1999).

### B. Other evidence allegedly demonstrating pretext

Nash also attempts to show pretext in other ways, but none of his arguments is availing.

Nash contends that the reasons given for his discharge have no basis in fact. He argues solo troubleshooting and off-site solo trips "were never duties of the lab tech or lab tech intern position[s]" and that Optomec's written job description for these positions did not include such responsibilities. (Mem. in Opp'n at 36-37.) But this is hardly surprising, as Lees testified it was his vision for the *future* of the lab technician position, and Nash's inability to fit that vision, that led to his dismissal decision. As noted above, Lees testified he was "changing his views" on the functions of lab technicians as he was "looking ahead," and he wanted individuals who "were able to support customers and undertake, you know, *a higher level of troubleshooting than we had been doing to that point*." Lees's testimony is entirely consistent with him informing Nash in the termination meeting that he was performing adequately but the company wanted to go in a "different direction." And, Nash offers no evidence to rebut those assertions. He

nowhere suggests, for example, that the functions of lab technicians did not actually change following the termination of his employment, or that later lab technicians were not required to perform solo troubleshooting or off-site trips. Employers, of course, "are allowed to determine the responsibilities and qualifications of a given position, and courts do not otherwise second-guess the employer's judgment." Robert v. Carter, 819 F. Supp. 2d 832, 843 (S.D. Ind. 2011) (citations omitted). The fact that lab technicians had not *previously* performed solo troubleshooting duties does not suggest the proffered reason for Nash's discharge "has no basis in fact."[8]

Nash also claims Lees stereotyped him as having "limited capabilities," "physical dexterity problems," "stubbornness," the "inability to think on his feet," and similar traits that, Nash claims, were based on his age. But Nash does nothing to connect these alleged "stereotypes" to *ageism*. Indeed, believing an employee is stubborn or has "limited capabilities" or "physical dexterity problems" does not on its face suggest a supervisor is engaged in ageist stereotyping; are stubbornness and physical problems the exclusive

---

[8] Nash also argues he was never informed of his so-called deficiencies and did not receive a formal performance review from Optomec. But the record reveals that the company's concerns existed from the very beginning of Nash's internship, and Lees hired Nash for a "permanent" position *despite* those concerns. This hardly suggests, as Nash argues, that Lees "never informed him of the deficiencies because he did not want Nash to improve in order to remain at the company." (Mem. in Opp'n at 45.) Furthermore, the evidence is clear that Optomec performed reviews on an annual basis, and Nash did not work for the company for a full year before his employment was terminated. Indeed, Nash acknowledges the company was preparing to undertake his review shortly before his termination, as he was asked to perform a self-appraisal in May 2014 "in advance of his performance review." (Id. at 22.) While an employer's failure to follow its own policies might be indicative of pretext, see, e.g., Dixon v. Pulaski Cnty. Special Sch. Dist., 578 F.3d 862, 871 (8th Cir. 2009), there is no evidence here suggesting Optomec failed to follow its own review policies. See also Smith v. Allen Health Sys., Inc., 302 F.3d 827, 835 (8th Cir. 2002) (failure to give written warning prior to termination "does not tend to prove that the reason given for [the] firing was pretextual").

domain of older employees?  Moreover, the concerns about Nash's (alleged) inability to think on his feet and grow his skills were documented from the beginning of his tenure with Optomec, including Lees's assessment of Nash to DCTC, and were expressed not only by Lees, but also by Wright.

Nash next claims Optomec has offered shifting reasons for his termination.  To be sure, an employer's shifting reasons for an employee's discharge can be probative of discrimination.  See, e.g., Wierman v. Casey's Gen. Stores, 638 F.3d 984, 1001 (8th Cir. 2011).  Yet, changes to the proffered reason are only probative if the discrepancy is substantial.  Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014) (*en banc*); Morris v. City of Chillicothe, 512 F. 3d 1013, 1019 (8th Cir. 2008).  Stating a proffered reason in different wording or explaining additional aspects of the reason are not substantial changes.  See Loeb v. Best Buy Co., 537 F.3d 867, 873 (8th Cir. 2008); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 835 (8th Cir. 2002).

The Court perceives no substantial change here.  Nash contends he was told in the termination meeting that he was being discharged not because of his performance, but rather because the company wanted to go in a "different direction."  Then, in response to a request under Minnesota law following his termination,[9] Optomec informed him by letter that he did "not possess the full breadth of skills required to successfully meet the challenges required" for the position.  The company noted that "while [Nash's] work was satisfactory in terms of performing more menial tasks, [he] failed to demonstrate the

---

[9] Minnesota Statutes § 181.933 provides that an employee who has been involuntarily terminated "may, within 15 working days following such termination, request in writing that the employer inform the employee of the reason for the termination."

necessary ability to troubleshoot system issues or perform service trips." Nash contends this represents a change from the termination meeting and that Optomec was claiming he was discharged "for performance reasons." But that is not at all what Optomec said – indeed, the word "performance" nowhere appears in the letter. Rather, Optomec told Nash he did not possess skills to "meet the challenges required" for the position – entirely consistent with Lees's changing vision for the lab-technician role.

Finally, Nash contends that neither Lees nor Wright denied, in the termination meeting, that he was being discharged because of his age. According to Nash, "[t]he failure to specifically deny [his] accusation that he was being fired because of his age creates an adverse inference against Optomec for age discrimination." (Mem. in Opp'n at 52.) He cites no law for this proposition, however, and the Court is unaware of any.[10] Nor, in the Court's view, do Lees's and Wright's (alleged) silence suggest discrimination under the circumstances here. While Nash challenges that he became *threatening* in the termination meeting, it is undisputed he became *upset* and repeatedly mentioned that his mother had sued a former employer for age discrimination and had prevailed. In this Court's view, it makes eminent sense that supervisors would choose to defuse such a situation by declining to engage in a tit-for-tat with a distressed employee who had just been fired. Lees's and Nash's silence do not suggest that they were tacitly admitting discrimination.

---

[10] The two cases Nash *does* cite – Baxter v. Palmigiano, 425 U.S. 308 (1976), and National Acceptance Co. of America v. Bathalter, 705 F.2d 924 (7th Cir. 1983) – involved the Fifth Amendment's protection against self-incrimination in criminal matters and are inapposite.

## CONCLUSION

All told, Nash has failed to create a genuine issue that age played a role in Optomec's termination of his employment. Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Optomec's Motion for Summary Judgment (Doc. No. 18) is **GRANTED** and Nash's Complaint (Doc. No. 1, Ex. B) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  May 5, 2016                                          s/Richard H. Kyle
                                                            RICHARD H. KYLE
                                                            United States District Judge